**McDATA CORP., a Delaware corporation, Plaintiff,**

**v.**

**BROCADE COMMUNICATIONS SYSTEMS, INC., a Delaware corporation, Defendant.**

**No. CIV.A.02–K–303 (BNB).**

United States District Court, D. Colorado.

Dec. 6, 2002.

Christopher Beall, Faegre & Benson, Denver, CO, for Plaintiff.

Irwin Robert Gross, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, Sean D. Baker, Wheeler, Trigg & Kennedy, Denver, CO, for Defendant.

### ORDER ON MOTION FOR PRELIMINARY INJUNCTION

KANE, Senior District Judge.

This is a patent infringement action by McDATA Corp. ("McDATA"), a Delaware corporation based in Broomfield, Colorado,

against Brocade Communications Systems, Inc. ("Brocade"), a Delaware corporation based in San Jose, California. McDATA asserts Brocade's current generation of Fibre Channel products, the SilkWorm 3200, SilkWorm 3800 and SilkWorm 12000, infringe upon McDATA's U.S. Patent No. 6,233,236 ("'236 Patent"). McDATA has moved for a preliminary injunction barring Brocade from distributing license keys for the software that uses, relies upon, and/or enables a user to access the allegedly infringing technology incorporated into the accused products.

The parties engaged in expedited discovery related to the issues presented by McDATA's motion and submitted briefing on them before and after a five-day evidentiary hearing. In addition to the live testimony during this hearing, the parties submitted extensive designations of deposition testimony, including attached deposition exhibits; videotape excerpts of the depositions of two witnesses; sworn declarations and voluminous documentary evidence.

Having considered the briefing, testimony and evidence submitted by the parties, and being fully advised of the premises, I deny McDATA's motion for preliminary injunction because it has failed to demonstrate it is likely to prevail over Brocade's contract defense to this action. The findings of fact and conclusions of law supporting this decision are set out below. In light of the expedited and abbreviated nature of discovery and proceedings relating to McDATA's motion, I caution the parties that these findings and conclusions are provisional and are intended only for the purpose for which they are made, which is determination of McDATA's request for pretrial injunctive relief. *See University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981);

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,* 237 F.3d 1359, 1363 (Fed.Cir. 2001). These findings are not binding on the parties at trial. *Camenisch,* 451 U.S. at 395, 101 S.Ct. 1830.

## I. FACTUAL BACKGROUND

### A. History and Relationship of the Parties

McDATA was founded in 1982 and for many years has been a leader in the development, manufacture, and sale of switches used in the storage area network ("SAN") industry. McDATA's focus is on high-end, director-class fabric switches, a segment of the switch market in which it held a leading market share as of the commencement of this action.

In approximately 1995, McDATA determined a new, high-speed interconnect technology called Fibre Channel was the medium of the future in this field and began efforts to enter the Fibre Channel switch market. Because it did not have in-house expertise in this new technology, McDATA sought the assistance of Brocade, a newly formed company focused on Fibre Channel technology. At that time, Brocade did not compete directly with McDATA in the director-class switch market segment.

In May 1996, McDATA and Brocade entered into a Purchase and License Agreement authorizing McDATA to purchase various Brocade components for repackaging and resale as part of McDATA's first Fibre Channel switch. Later that year, the companies entered into an additional agreement, the 1996 Technology Agreement, in which McDATA engaged Brocade to modify two of Brocade's first generation Fibre Channel ASICs,[1] its

---

**1.** An ASIC is an Application Specific Integrated Circuit, which is a customized silicon chip

used in the switch products at issue.

Stitch ASIC and FLannel ASIC, for use in a high-end, director-class Fibre Channel switch otherwise developed and produced by McDATA.

Pursuant to the 1996 Technology Agreement, Brocade provided McDATA with technical information regarding the design and function of the Stitch and FLannel ASICs and another non-director-class Brocade switch containing the Stitch ASIC, the SilkWorm 1000. This included information regarding the ability of these products to measure and report data traffic flow through a switch.

Brocade's work with McDATA under the 1996 Technology Agreement resulted in its development of the Felt ASIC, a customized version of the Stitch ASIC, and the McFLannel ASIC, a customized version of the FLannel ASIC. McDATA incorporated Brocade's Felt ASIC in the ED–5000, a director-class switch McDATA released in 1998.

At the same time that McDATA was working with Brocade to develop customized ASICs for its ED–5000 director-class switch, it was seeking other ways to build a position in the Fibre Channel switch market. McDATA's efforts included its own development of a new ASIC, known as "Viper," and, in March, 1997, its acquisition of Hewlett–Packard's Canadian Network Operations division ("HP–CNO"), which was focused on Fibre Channel switch development and sales.

In October 1997, McDATA accused Brocade of misappropriating and using certain HP–CNO technology and demanded that Brocade pay it royalties. In the course of negotiations to resolve McDATA's accusations, Brocade accused McDATA of misappropriating certain Brocade technology Brocade had disclosed to McDATA in 1996. The parties could not come to an agreement resolving their dispute and, on March 4, 1998, McDATA filed suit against Brocade for trade secret misappropriation.

Brocade filed a counter-suit shortly thereafter.

Six days after Brocade filed suit, under pressure from its parent company and in need of assurances of an uninterrupted supply of Brocade ASICs, McDATA agreed to settle its suit against Brocade. Under the terms of the settlement, McDATA and Brocade agreed to dismiss their respective lawsuits with prejudice in return for amending their 1996 agreements: (1) to require McDATA to pay Brocade a total of $3 million for a fully paid up license on Brocade's customized Felt and McFLannel ASICs; (2) to require Brocade to sell these ASICs to McDATA as long as McDATA was current on these license payments; and (3) to license to each other all of their other Fibre Channel intellectual property, including patents and know-how, in existence as of April 1, 1998.

A few months later, in mid–1998, Hewlett–Packard ("HP") told Brocade it had won a competitive bid for HP's purchase of Fibre Channel switches. HP subsequently informed Brocade, however, that due to certain terms of a contract between HP and McDATA (stemming from HP's sale of HP–CNO to McDATA), HP was required to purchase its current generation switches from McDATA. HP therefore requested that Brocade enter into a three-way relationship with HP and McDATA under which Brocade would sell switch components to McDATA for use in McDATA switches to be sold to HP. Based on its communications with HP, Brocade believed HP's request and its decision not to purchase switches directly from Brocade were the result of legal threats by McDATA..

Given this belief and its recent patent infringement litigation with McData, Brocade was reluctant to enter into another business relationship with McDATA and only did so after a protracted negotiation

period. McDATA and Brocade ultimately reached agreement, however, and entered into a new Original Equipment Manufacturer ("OEM") and License Agreement ("1999 OEM Agreement"). This Agreement contains a covenant not to sue by McDATA that Brocade asserts as a bar to this action.

## B. The Parties' Development of Performance Monitoring Technology

As the parties' commercial relationship was deteriorating and the competition between them increasing, their engineers were continuing to develop technology to incorporate in the next generation of their respective Fibre Channel switches. By the fall of 1997, McDATA engineers Jeff Nelson and Michael O'Donnell had developed a method and device for measuring and monitoring data traffic flow within a Fibre Channel fabric switch. In January 1999, Nelson and O'Donnell applied for a patent on this technology, which resulted in the issuance of the '236 patent on May 15, 2001.

McDATA incorporated this patented technology, which it refers to as "Template Register Technology," in its new, McDATA-developed Viper ASIC. McDATA shipped its first product containing the Viper ASIC in October 2000. As of July, 2002, however, McDATA had not developed and made available to the market software that allows an end-user to access and use the functions provided by the Template Register Technology in McDATA's Viper-based switches. As of the date of the preliminary injunction hearing, McDATA anticipated having a product with functionality based on the patented technology in the fourth quarter of this year.

Brocade's engineers, meanwhile, in late 1998 independently began working on ways to better measure and monitor traffic flow through a Fibre Channel switch. By mid–1999 Brocade had started incorporating the resulting technologies, which it calls collectively "Frame Filtering" technology, into its next generation "Bloom" ASIC. McDATA alleges two features of this Frame Filtering technology, "Filter–Based Performance Monitoring" and "End–to–End Performance Monitoring," infringe on McDATA's Template Register Technology as claimed in the '236 Patent. Brocade and McDATA also refer to these allegedly infringing features as Brocade's "Advanced Performance Monitoring."

## C. Brocade Launches Director–Class and Other Switches with Advanced Performance Monitoring Features

By 2001 or earlier, Brocade had established itself as the dominant player in the non-director class Fibre Channel switch market.[2] In April 2001, it announced it was entering the director market dominated by McDATA through production of the SilkWorm 12000, a director-class switch that would compete directly with McDATA's most recent director product. Brocade's product announcement stated the SilkWorm 12000 would include Brocade's Frame Filtering technology. The first generally available Brocade product containing the Bloom ASIC and its Frame Filtering technology, however, was the lower-end SilkWorm 3800 switch, which became available for purchase in October 2001.

Brocade launched the director-class SilkWorm 12000 in April 2002, following extensive marketing efforts promoting this

---

**2.** According to Marc Staimer, McDATA's marketing expert, Brocade had captured 80 to 90 percent of the general, non-director class Fibre Channel switch market as of 2002.

McDATA has traditionally had a similarly dominant position in the separate and much smaller director-class Fibre Channel switch market.

new product and its new features, including Filter–Based Performance Monitoring and End–to–End Performance Monitoring. In both this switch and other Brocade products with the Bloom ASIC, these Advanced Performance Monitoring features are an optionally licensed product, meaning that in order to enable this functionality the customer needs to purchase an optional software license key.

When Brocade first began promoting the Frame Filtering technology in its new products in April, 2001, McDATA became concerned that the Advanced Performance Monitoring features of these products might infringe on their Template Register Technology as set forth in the '236 Patent. Accordingly, in December, 2001, approximately two months after the first Brocade switches containing these features became commercially available, McDATA obtained three Brocade switches in order to test their Advanced Performance Monitoring features and determine whether they infringed on the '236 Patent. McDATA concluded they did and on February 14, 2002, filed this action alleging the SilkWorm 3800, Brocade's Silkworm 12000 switch and any other Brocade switches incorporating Brocade's Frame Filtering technology infringe on the '236 Patent. McDATA filed its motion for preliminary injunction a little more than two weeks later.

## II.  STANDARD OF REVIEW

The law of the Federal Circuit governs requests for preliminary injunctions to enjoin patent infringement. *See Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n. 12 (Fed.Cir.1988). Under this authority, McDATA is entitled to a preliminary injunction if it shows the following four fac-

tors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm absent an injunction; (3) that the balance of hardships tips in its favor; and (4) that the public interest favors issuance of the injunction. *Tate Access Floors, Inc. v. Interface Arch. Resources, Inc.*, 279 F.3d 1357, 1364–65 (Fed.Cir.2002); *Purdue*, 237 F.3d at 1363. While granting a preliminary injunction requires analysis of all four factors, no one of which is dispositive, *see Tate*, 279 F.3d at 1365, a trial court may "deny a motion based on a patentee's failure to show any one of the four factors— especially either of the first two—without analyzing the others." *Jack Guttman, Inc. v. Kopykake Enterps., Inc.*, 302 F.3d 1352, 1356 (Fed.Cir.2002).

The Federal Circuit standards for deciding motions to enjoin patent infringement are not intended to be any more or less stringent than those applied to requests for preliminary injunctions in other areas of law.[3] *See High Tech Medical Instrumentation, Inc. v. New Image Industs., Inc.*, 49 F.3d 1551, 1554 (Fed.Cir.1995). Accordingly, I review McDATA's motion in light of the general rule that preliminary injunctive relief is an extraordinary remedy to be granted only where the right to relief is clear and unequivocal. *See, e.g., id.; SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098–99 (10th Cir.1991).

## III.  ANALYSIS

McDATA claims Brocade's Silkworm 12000, 3800, and 3200 Fibre Channel switches (collectively the "accused products") infringe claims 1, 6, and 12 of the '236 Patent. In response to these allegations, Brocade disputes its products infringe on the Patent and also asserts

**3.** An exception to this statement is the Federal Circuit rule recognizing a rebuttable presumption of irreparable harm in patent infringement actions if the patentee makes a clear showing it is likely to succeed in proving

its patent is valid and being infringed upon by the defendant. *See, e.g., Purdue*, 237 F.3d at 1363; *Polymer Techs. v. Bridwell*, 103 F.3d 970, 973 (Fed.Cir.1996).

three affirmative defenses, each of which Brocade contends creates, at minimum, a substantial question sufficient to defeat McDATA's request for a preliminary injunction. Brocade's affirmative defenses are: (1) Claims 1, 6, and 12 of the '236 Patent are anticipated and rendered invalid under 35 U.S.C. § 102(b) by the Silkworm 1000 switch with the Stitch ASIC and the Silkworm 1000 switch with the FLannel ASIC; (2) the '236 Patent is unenforceable due to inequitable conduct by the patent's named inventors; and (3) McDATA is precluded from maintaining this case by the covenant not to sue in the 1999 OEM Agreement.

In order to establish a likelihood of success on the merits for purposes of its motion for preliminary injunction, McDATA must show a reasonable likelihood: (1) it will succeed on the merits of its claim that Brocade's accused products infringe claims 1, 6, and/or 12 of the '236 Patent; and (2) it will overcome each of the affirmative defenses asserted by Brocade. *See Purdue*, 237 F.3d at 1363; *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed.Cir.1997). Although Brocade will bear the burden of proof on each of its defenses at trial, *see, e.g., Genentech*, 108 F.3d at 1364 n. 2, *Union Pac. Resources Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 693 (Fed.Cir.2001), in connection with this preliminary injunction motion it need only demonstrate a substantial question concerning each defense to shift the burden to McDATA to produce countervailing evidence and argument showing the defenses lack substantial merit. *See Purdue*, 237 F.3d at 1363; *Genentech*, 108 F.3d at 1364.

The parties presented voluminous evidence and argument regarding McDATA's infringement claim and each of Brocade's affirmative defenses. For the reasons stated below, I find McDATA has failed, at minimum, to demonstrate the requisite likelihood of success in defeating Brocade's contract defense. As a result, I need not address the other preliminary injunction factors or McDATA's likelihood of success on the merits on the other issues presented, which require potentially far-reaching decisions regarding the proper construction of the disputed claims as a matter of law[4] and the likelihood of McDATA prevailing on its infringement claim given that construction and of defeating Brocade's additional assertions that '236 Patent is invalid and otherwise unenforceable against it and, by implication, other parties. When these weighty matters need not be addressed to decide a request for preliminary relief, they are most appropriately resolved at a full trial on the merits rather than in an expedited proceeding such as this. *Cf. Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.*, 74 F.3d 1216, 1221 (Fed.Cir.1996) (trial court not required to interpret claims conclusively in early stage of case and may exercise its discretion to interpret the claims at a later time when parties have presented full picture of claimed invention and prior art).[5]

4. To determine McDATA's likelihood of success on its patent infringement claim, I must first construe the disputed claim language as a matter of law, then compare the properly construed claims to Brocade's accused products. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1365 (Fed.Cir.2002). The first step in this analysis is a question of law informed by intrinsic and, if appropriate, extrinsic evidence. *See id.* at 1366; *Purdue*, 237 F.3d at 1364. The second step is a question of fact. *See Purdue*, 237 F.3d at 1364. Claim construction is also the necessary first step to deciding Brocade's claim that the '236 Patent is invalid because the claims-at-issue were anticipated by prior art containing all of their elements.

5. To assist the parties in preparing for subsequent proceedings in this case, however, I will say that my consideration of the evidence and argument presented by the parties to date leads me to favor Brocade's construction of

■ I find McDATA has not established a reasonable likelihood of defeating Brocade's contract defense based on the following findings of fact and conclusions of law:

Section 11.2 of the 1999 OEM Agreement is entitled "Cross–License and Covenant Not to Sue." Subparagraph (ii) of this section states:

*McDATA hereby grants to BROCADE a perpetual, non-exclusive, non-transferable, worldwide, royalty-free license, without the right to sublicense, under the McDATA Patents and the McDATA Know-how to make, use, sell, offer to sell, lease, import and otherwise transfer the Fibre Channel-based Products,* and **McDATA covenants that, to the extent that BROCADE and BROCADE's customers and distributors exercise the rights expressly granted herein, McDATA will not assert any patent or trade secret rights against BROCADE or its direct or indirect customers.**

(all emphasis added). Subparagraph (i) of Section 11.2 sets out a matching cross-license and covenant not to sue from Brocade to McDATA.

Brocade and McDATA agree the underlined portion of Section 11.2(ii) is a license from McDATA to Brocade for McDATA Patents and McDATA Know-how. Both of these terms are expressly defined in the 1999 OEM Agreement as McDATA patents, patent applications and "know-how" in existence as of April 1, 1998.[6] 1999 OEM Agreement, § 11.1(d), (e).

Both parties further agree that in the bold, italicized portion of Section 11.2(ii), McDATA covenants not to sue Brocade, but the parties dispute the scope of that covenant. Brocade contends the covenant not to sue means that McDATA may not assert any patent or trade secret claim against Brocade, including claims such as those asserted in this action, as long as Brocade exercises its rights under the license granted by Section 11.2(ii). McDATA contends the covenant not to sue is not so broad, and does not apply to this action, because it only bars claims against Brocade with respect to the particular patents and trade secrets licensed under Section 11.2(ii), i.e., the pre-April 1, 1998 patents, patent applications and trade secrets covered by the defined terms "McDATA Patents" and "McDATA Know-how."

■ By its terms, the 1999 OEM Agreement is to be governed and interpreted according to the law of the State of California. Under California law, a contract must be interpreted to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. *See* Cal. Civ.Code, § 1636; *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.,* 281 F.3d 929, 934 (9th Cir.2002) (applying California law); *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Cal.App.4th 445, 80 Cal.Rptr.2d 329, 349 (1998). I must determine the parties' intent from the words used in the written agreement if possible, *see* Cal. Civ.Code § 1639, but, if the parties offer conflicting interpretations of the relevant contract language and that language is reasonably susceptible to both interpretations, then I must consider extrinsic evidence offered by the parties to determine their mutual intent. *See Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 39–40, 69 Cal.Rptr. 561, 442 P.2d 641

---

the Claims 1, 6 and 12 of the '236 Patent and its contention that, under this construction, the '236 Patent is invalid because it was anticipated by Brocade's Silkworm 1000 switches with the Stitch or FLannel ASIC.

6. Certain joint patents between McDATA and IBM and related know-how, which are not relevant here, are excluded from these definitions. (*Id.*)

(1968); *Morey v. Vannucci*, 64 Cal.App.4th 904, 75 Cal.Rptr.2d 573, 578 (1998); Cal. Civ.Code § 1647.

The covenant not to sue states that "to the extent that Brocade and Brocade's customers and distributors exercise the rights expressly granted" in the accompanying license, McDATA "will not assert *any patent or trade secret rights*" against Brocade. The highlighted terms are not defined in the 1999 OEM Agreement and on their face are broader than the temporally limited definitions of "McDATA Patents" and "McDATA Know–How" used in the license portion of Section 11.2. The plain language of the covenant not to sue, therefore, is not only reasonably susceptible to Brocade's interpretation of this provision, it supports Brocade's contention that the mutual intention of the parties was to bar McDATA from bringing an infringement action against Brocade on any McDATA patent, including future patents such as the '236 Patent, so long as Brocade and its customers and distributors exercise their rights under the companion license.

McDATA's conflicting interpretation of the covenant not to sue focuses on the use of the word "rights" in both the covenant's limiting clause, "to the extent that Brocade ... exercise[s] the *rights* expressly granted," and in the clause defining the scope of the covenant, in which McDATA agrees it "will not assert any patent or trade secret *rights.*" McDATA argues that the word "rights" must have the same meaning in both portions of the covenant, that the term "rights" is defined in the limiting clause as those "rights" granted by the Agreement and, therefore, that the scope of the covenant not to sue is limited to McDATA patents and know-how to which rights were granted in the Agreement, which, by definition, are those McDATA patents, patent applications and know-how in existence as of April 1, 1998.

The difficulty with McDATA's argument is that it ignores the word "any" in the clause defining the scope of the covenant. *See* 1999 OEM Agreement, § 11.2(ii) ("McDATA will not assert *any* patent or trade secret rights against Brocade;" emphasis added). *See Cole v. Low*, 81 Cal. App. 633, 254 P. 676, 678 (1927) (contract must be construed to give effect to every clause and word in it unless such construction would be obviously repugnant to the parties' intentions or would lead to some absurdity); *Atascadero*, 80 Cal.Rptr.2d at 349 (courts must interpret contractual language in a manner to give effect to every provision and not in a way that renders some clause nugatory, inoperative or meaningless). I nonetheless held at the beginning of the preliminary injunction hearing that the language of the covenant was reasonably susceptible to McDATA's conflicting interpretation and was therefore ambiguous. *See City of Chino v. Jackson*, 97 Cal.App.4th 377, 384–85, 118 Cal.Rptr.2d 349 (2002). As a result, I further held, consistent with California law, that I would admit and consider the parties' extrinsic evidence regarding the covenant to determine which of their interpretations is more likely to be the one upon which they mutually agreed. *See Pac. Gas & Elec.*, 69 Cal.2d at 36, 69 Cal.Rptr. 561, 442 P.2d 641 (extrinsic evidence admissible to explain meaning of written instrument when "the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible"); *Morey*, 75 Cal. Rptr.2d at 578 (extrinsic evidence admissible to interpret language of written instrument "as long as it is not used to give the instrument a meaning to which it is not reasonably susceptible").

The parties responded by presenting live and deposition testimony and, in some cases, declarations from the individuals who negotiated the 1999 OEM Agreement

and documentary evidence.[7] In considering this evidence, I am mindful that extrinsic evidence showing a party held a certain belief concerning the meaning of a contested contract provision is only evidence of the parties' mutual intent under California law if the party communicated that belief to the opposing party. *See Yount v. Acuff Rose–Opryland,* 103 F.3d 830, 836 (9th Cir.1996) (applying California law); *Alex Robertson Co. v. Imperial Cas. & Indem. Co.,* 8 Cal.App.4th 338, 10 Cal.Rptr.2d 165, 170 (1992). "[T]he subjective, unexpressed and uncommunicated thoughts of a party are irrelevant to the material issue of the parties' intent." *Union Bank v. Winnebago Indus., Inc.,* 528 F.2d 95, 99 (9th Cir. 1975) (applying California law).

Brocade relies principally[8] on the testimony and declarations of Greg Reyes, its Chief Executive Officer, and Charlie Smith, its then Vice President of Worldwide Sales and Brocade's chief negotiator on the 1999 OEM Agreement, to establish its intent with respect to the covenant not to sue and that this intent was communicated to McDATA without objection. Reyes testified at the hearing that he viewed the covenant not to sue as the "cornerstone" of the 1999 OEM Agreement and that it was "crucial" to Brocade that this covenant bar McDATA from bringing any intellectual property actions against Brocade. He further testified he instructed Charlie Smith to ensure that the agreement protected Brocade from any intellectual property litigation with McDATA concerning Fibre Channel products, and communicated to HP verbally and in writing that this was a pre-condition for it entering into the agreement with McDATA HP had requested. Reyes also testified he specifically communicated Brocade's intent that the covenant not to sue protect it from any future patent or trade secret lawsuits by McDATA to Jack McDonnell, McDATA's CEO, and Mike Klayko, McDATA's lead negotiator on the 1999 Agreement, at a February 3, 1999 meeting and to McDonnell in subsequent meetings and telephone calls. I find Reyes' testimony credible and consistent with his deposition testimony and declaration on these points.[9]

Smith's deposition testimony and declaration are also consistent with Reyes' account and evidence both Brocade's intent that the covenant not to sue bar any future intellectual property litigation between the parties (to the extent they continued to exercise their respective rights under the companion cross-licenses) and that this intent was communicated to McDATA.[10]

---

7. I did not allow certain witnesses McDATA proffered on this issue to testify because Brocade had not been able to depose them during the abbreviated pre-hearing discovery period.

8. Both Brocade and McDATA also labor to invoke various rules of contract construction to bolster their arguments regarding the meaning of the disputed covenant. Except as noted in the discussion above, I do not find these rules helpful in determining the parties' intent in this case. Brocade's argument, for example, that McDATA's interpretation of the covenant would render the covenant redundant and superfluous given the existence of the license, thereby violating a standard rule of construction, is not persuasive given the undisputed evidence that Brocade intended a "belt and suspenders," *i.e.,* redundant, approach to protecting itself from future litigation with McDATA.

9. McDATA mischaracterizes Reyes' deposition testimony when it asserts he admitted then that the scope of the covenant not to sue mirrored the scope of the cross-license. In fact, Mr. Reyes testified at his deposition that McDATA had agreed not to sue Brocade for intellectual property rights within the scope of the license "as part of" the covenant not to sue.

10. I have considered McDATA's purported evidence of bias on Smith's part, and find this evidence does not provide any basis for disregarding his testimony and declaration.

Smith testified in his deposition, for example, that Brocade drafted the reciprocal covenants not to sue, that its intent with respect to these provisions was to prevent both companies from suing each other on any patent and that he communicated this intent to McDATA representative Klayko during their negotiation of the 1999 OEM Agreement. He also testified McDATA was well aware of Brocade's desire for such a covenant no later than February, 1998, because he and Klayko discussed and agreed to a reciprocal covenant of even broader scope in a pre-litigation attempt to settle the dispute underlying McDATA's March 1998 suit against Brocade.[11] Smith testified Brocade was willing to give up its right to bring suit against McDATA in return for McDATA doing the same because Brocade believed it could beat McDATA in the marketplace, without resort to the courtroom. Brocade's concern, based on McDATA's 1998 litigation against it and Brocade's belief that McDATA had made legal threats to compel HP to do business with it, was that without such a covenant McDATA would use litigation as a weapon in the parties' business competition.

McDATA argues the testimony of Reyes and Smith should be disregarded because neither McDonnell nor Klayko recall any discussion of the covenant not to sue during negotiation of the 1999 OEM Agreement and because McDonnell testified he would have remembered the communications Reyes described and rejected any proposal for a covenant applying to future McDATA patents and other intellectual property. As previously stated, however, I find Reyes' testimony that he communicated Brocade's intent with respect to the covenant to McDonnell credible. McDATA's assertion that the intended scope of

the covenant as asserted by Brocade is too "incredible" and "absurd" for McDonnell and Klayko to have heard and then forgotten it also ignores the fact that the covenant not to sue, including its bar on suits regarding future patents, is reciprocal. That Brocade was willing to enter into an agreement that prevents it from suing McDATA for infringement of any current or future Brocade patent rights, so long as McDATA exercises its rights under the 1999 OEM Agreement, suggests that Brocade's interpretation of the covenant not to sue is not so incredible as McDATA claims.

McDATA also argues Reyes' and Smith's testimony regarding their intentions and communications with McDATA concerning the scope of the covenant should be disregarded because they are not corroborated by any contemporaneous written evidence. I disagree. Brocade in fact presented documentary evidence, in the form of Smith's notes from a September, 1998 planning meeting with HP about the proposed Brocade–McDATA agreement, supporting its claim that protection from legal obligation and liability to McDATA was a prerequisite to it entering into such an agreement. Certainly additional documentary evidence concerning Brocade and McDATA's intent and communications regarding this requirement would be helpful in determining the parties' mutual intent with respect to the covenant not to sue, but neither party has presented any such evidence or suggested it exists. The apparent lack of written evidence further corroborating the testimony of Brocade's Reyes and Smith does not compel me to disregard their credible testimony regarding their communications with McDATA.

---

11. The parties ultimately settled this dispute on different terms after McDATA filed suit and Brocade counter-sued.

McDATA's argument also implies that in the absence of contemporaneous written evidence corroborating Brocade's interpretation of the covenant not to sue, I must adopt McDATA's more limited intent and interpretation of the scope of this provision. This is incorrect, because McDATA did not present any evidence, verbal or written, suggesting it communicated its intent regarding the covenant to Brocade at any time during their negotiations.

Finally, McDATA argues its interpretation must be adopted because Brocade's attorneys drafted the contested provision, which must therefore be construed against Brocade. This rule only applies, however, if ambiguity concerning the parties' mutual intention remains following consideration of extrinsic evidence. *See* Cal. Civ.Code § 1654; *Decter v. Stevenson Props., Inc.*, 39 Cal.2d 407, 247 P.2d 11, 17 (1952). No such residual ambiguity exists here after consideration of the extrinsic evidence presented by the parties.

For the reasons stated above, I find, based on the record to date, that Brocade intended that the reciprocal covenants not to sue in Section 11.2 of the 1999 OEM Agreement would apply to assertion of any patent or trade secret rights, that it communicated this intent to McDATA and that McDATA never expressed a contrary intent. As a result, I find the covenant not to sue has this scope and reject McDATA's interpretation that would limit the scope of the covenant to patent, patent applications and know-how in existence as of April 1, 1998. I further find that this action, as an action seeking to assert McDATA's patent rights against Brocade, is within the scope of the covenant stated in Section 11.2(ii).

This conclusion does not complete the analysis, however. By its terms, the covenant not to sue continues in existence only to the extent that Brocade and Brocade's customers and distributors exercise the licensing rights granted in the companion license stated in Section 11.2. These licensing rights authorize Brocade to use in its Fibre Channel-based products technology encompassed in McDATA patents, patent applications and know-how in existence as of April 1, 1998. In its March, 1998 complaint against Brocade, McDATA alleged Brocade had incorporated McDATA trade secrets, *i.e.*, pre-April 1, 1998 McDATA Know-how, in Brocade's prior generation fibre-channel switch products. McDATA has not withdrawn this allegation, does not dispute that Brocade's accused products contain this same technology, and has not offered any other evidence that Brocade is not now exercising its right under the 1999 OEM Agreement to utilize pre-April 1, 1998 McDATA know-how and patents in its Fibre Channel-based products. Accordingly, on the record to date I find the covenant not to sue set forth in Section 11.2 continues in effect.

In light of these findings and conclusions, I find McDATA has failed to make the requisite showing it is likely to defeat Brocade's affirmative defense that this action is barred by the covenant not to sue stated in Section 11.2(ii) of the 1999 OEM Agreement. As a result, McDATA has not demonstrated it is likely to succeed on the merits of this action, and is not, therefore, entitled to the preliminary injunctive relief it seeks. *See Guttman*, 302 F.3d at 1356 (district court may deny preliminary injunction based on patentee's failure to show likelihood of success on the merits).

For the reasons stated above, McDATA's Motion for Preliminary Injunction is DENIED.