**STORAGE TECHNOLOGY CORPORATION,**
Plaintiff,

v.

**QUANTUM CORPORATION,**
Defendant.

**No. CIV.A. 03M672.**

United States District Court,
D. Colorado.

May 17, 2005.

Nancy J. Gegenheimer, Holme, Roberts & Owen, LLP, Denver, CO, Thomas A. Lewry, Brooks Kushman, P.C., Southfield, MI, Timothy Robert Schulte, Storage Technology Corporation Office of Corporate Counsel, Louisville, CO, for Plaintiff.

Ann Elizabeth Citrin, J. Eric Elliff, Morrison & Foerster, LLP, Stewart McNab, Carver, Kirchhoff, Schwarz, McNab & Bailey, LLC, Denver, CO, Christopher L. Kelley, Matthew E. Hocker, Howrey Simon Arnold & White, Menlo Park, CA, Floyd R. Nation, Howrey Simon Arnold & White, LLP, Houston, TX, for Defendant.

## FINDINGS, CONCLUSIONS AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

MATSCH, Senior District Judge.

Plaintiff Storage Technology Corporation ("StorageTek") is the owner of U.S. Patent No. 6,549,363, issued April 15, 2003 ("the '363 patent"). By its motion for preliminary injunction, StorageTek seeks to enjoin defendant Quantum Corporation ("Quantum") from selling magnetic tape cartridges identified as SDLT I and II on the ground that the magnetic tape component of those cartridges infringes Claim 1 of the '363 patent. The '363 patent relates to magnetic tape used for the storage of computer data. The patent involves magnetic tape having a magnetic storage medium formed on the tape's front surface for the placement of longitudinal data recording and playback tracks, and having an optical servo pattern located on the back surface. Servo information is used to control the relationship between the read/ write heads of a tape drive mechanism and data tracks on the tape.

■ The court has the power to grant injunctive relief "in accordance with principles of equity to prevent violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. The movant must present adequate evidence to prove four factors: "(1) a reasonable likelihood of success on the merits; (2) irreparable harm if the injunction were not granted; (3) the balance of hardships and (4) the impact of the injunction on the public interest." *Polymer Techs., Inc. v. Bridwell,* 103 F.3d 970, 973 (Fed.Cir.1996) (citing *Nutrition 21 v. United States,* 930 F.2d 867, 869 (Fed.Cir. 1991)). Based on the evidence presented at the hearing on March 21–24, 2005, the court finds and concludes that the equitable relief sought by StorageTek is not warranted at this stage of the proceedings.

The structure of the relevant market and the respective roles of StorageTek and Quantum in that market are important to this determination. StorageTek and Quantum both sell equipment for use in systems for storage of large volumes of information in electronic form. Such systems are used to maintain and archive data so that information is not lost in the event of a computer or computer network failure, human error, computer viruses, or other difficulties. Components of such systems include tape drives that operate to read and write data on magnetic tape. Tape cartridges, each containing spooled magnetic tape, hold the tape, and when used in conjunction with a tape drive, control the proper movement of the tape in the system. The product at issue is magnetic tape known as SDLT (Super Digital Linear Tape) made for use with SDLT drives manufactured by Quantum.

Mr. John Gannon, Quantum's president and chief operating officer, testified that the tape automation market falls into two segments, referred to in the industry as the "enterprise" and "mid-range" segments. Customers in the enterprise segment are generally large corporations or entities with heavy data storage needs,

such as those who store data from mainframe computers or computer centers. Because enterprise customers typically require frequent access to the stored data, the equipment used must be very durable and is more expensive or "high end." StorageTek and IBM are the two primary suppliers of tape automation systems and related products in the enterprise market segment. Mid-range products are less expensive, smaller systems suitable for business uses such as the storage of e-mail communications, where the stored data does not need to be accessed frequently. Quantum is a leading provider of tape drives and related products in the mid-range market.

In 1994, Quantum acquired the disk and tape divisions of Digital Equipment Corporation, and thereby acquired tape technology known as DLT (digital linear tape) technology. DLT tape drive systems record data in a linear pattern on magnetic tape. Each data track goes the entire length of the tape, which may be as long as 1800 feet. During recording, the first set of tracks is recorded on the length of the tape. When the end of the tape is reached, the heads are repositioned to record another set of tracks, lengthwise in the opposite direction, and this process is repeated until the tape reaches full capacity. SDLT tape products, introduced by Quantum in 2001, are the latest generation of the DLT technology. SDLT drives and tape, like the earlier DLT products, are designed for the recording of longitudinal data tracks. Data is recorded on the front surface of the tape which is coated with a material containing magnetic particles. SDLT drives have magnetic heads that read and write data tracks. A new feature of SDLT technology is that SDLT tape has laser-etched tracks on the tape's backcoating. SDLT drives have heads for optically detecting these back side servo tracks and a system for using this information to position the magnetic read/write heads as the tape moves across the tape head.

Quantum manufactures SDLT drives. Quantum does not manufacture the magnetic tape used with its tape drives. The magnetic tape is on a reel in a cartridge device. The subject tape is a component of cartridges manufactured in Japan by three companies: Maxell, Fuji and Sony, according to Quantum's specifications and a license granted by Quantum on the other internal components of the cartridge. Quantum resells SDLT tape cartridges manufactured by these companies.

As set forth above, StorageTek and IBM are the two primary suppliers of data storage products in the enterprise segment. StorageTek produces and sells tape automation libraries. Tape automation libraries are large systems that hold magnetic tape cartridges and tape drives and have robotic devices that can automatically select and mount a cartridge into a tape drive. StorageTek manufactures its own tape drives, as does IBM, and tape libraries produced for the enterprise segment incorporate either IBM or StorageTek tape drives.

StorageTek also competes in the mid-range market, but does not manufacture its own drives for that market segment. Tape drives made for use by mid-range customers fall into two categories—the LTO (Linear Tape Open) type and the SDLT type. LTO type drives are manufactured by IBM, Hewlet Packard and Quantum. Quantum is the only manufacturer of SDLT drives. StorageTek is one of Quantum's original equipment manufacturer ("OEM") customers. StorageTek buys Quantum's SDLT tape drives and incorporates those drives into some of StorageTek tape library products. StorageTek, like Quantum, is a reseller of SDLT tape cartridges.

SDLT tape products—that is, the drives, the tape cartridges, and systems that use such drives and tape—are sold by a number of companies, including Quantum, Fuji, Hewlett Packard, Imation, Maxell, Sony, StorageTek, and others. The leading sellers of SDLT products are Quantum, Fuji, Hewlett Packard, Imation and Maxell. StorageTek is a major competitor in the enterprise market segment, but it has only a small share of the mid-range SDLT tape market. SDLT tape cartridges are available for purchase from all the companies that sell SDLT products. The Japanese manufacturers (Fuji, Maxell and Sony) can sell directly under their license agreements with Quantum. Those tape manufacturers are not parties to this suit, and StorageTek is not seeking to enjoin their activities. StorageTek is not attempting to enjoin the use of SDLT tape by those who have purchased tape automation systems incorporating SDLT drives.

█ The main effect of the requested relief would be to re-direct Quantum's SDLT customers to other competitors. Mr. John Benson, StorageTek's vice president and general manager of automated tape solutions, testified that if Quantum were enjoined from selling SDLT tape, StorageTek could sell to a broader market. If Quantum alone were enjoined from selling SDLT tape, however, there is no assurance that StorageTek's share of the mid-range SDLT market would increase significantly. Moreover, StorageTek does not manufacture the tape covered by the '363 patent, and the primary benefit of its patent ownership is the royalties to be obtained through licensing. Notably, IBM and StorageTek have a cross-licensing agreement whereby IBM can sell products covered by StorageTek patents. This licensing arrangement shows that any harm StorageTek may suffer as a result of the alleged infringement could be redressed by money damages. SDLT tape was marketed for more than two years before StorageTek obtained the '363 patent in 2003, and this lawsuit has been pending since April 2003. There is no apparent need for injunctive relief before trial.

Another factor weighing against the relief sought by StorageTek is that the SDLT tape is not sold as a separate product. It is sold as a component of a tape cartridge. Features of the tape cartridge device are covered by another patent or patents held by Quantum. It is not possible to tailor an injunction directed only to the patented tape. The public interest would not be served by an injunction that affects products not covered by the '363 patent. This fact affects the balance of hardships between the parties. Quantum gained prominence in the mid-range market through its DLT products before the introduction of the SDLT cartridges. Quantum's "DLTape Handbook" describes numerous features of DLT and SDLT technology that contribute to their speed, capacity, and reliability. Among those features are the tape cartridge design and properties of the tape's magnetic coating. The invention of the '363 patent does not concern any of those features.

In short, the requested relief, if granted, would have effects beyond what is necessary or appropriate for the protection of StorageTek's rights. An injunction prohibiting Quantum from selling SDLT tape would damage its customer relationships and status in the market for data storage products. Such an injunction could create concern in the marketplace about the future of SDLT products and negatively impact sellers and buyers of SDLT products who are not parties to this action. The extent to which StorageTek would profit from entry of a preliminary injunction is uncertain, and any harm it is presently suffering from the alleged infringement is compensable by money damages.

StorageTek argues that irreparable harm is shown where the movant shows a likelihood of success on the merits of its claims for patent infringement. Storage-Tek's reliance on that principle overstates the strength of its case presented at the hearing. Quantum concedes that the tape components of the SDLT I and II cartridges infringe the '363 patent. Its defense is the asserted invalidity of the patent. The focus of the evidence presented at the preliminary injunction hearing was Quantum's defense that claim 1 of the '363 patent is anticipated or rendered obvious by prior art and thus invalid under 35 U.S.C. §§ 102(b) or 103.

■ A patent is presumed valid, and the party challenging validity bears the ultimate burden of proof at trial of proving invalidity by clear and convincing evidence. 35 U.S.C. § 282; *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1365 (Fed.Cir.2001). When an invalidity defense is raised in response to a motion for preliminary injunction, the plaintiff "retain[s] the burden of showing a reasonable likelihood that the attack on its patent's validity would fail." *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387 (Fed.Cir.1987). The plaintiff must show that the defense lacks substantial merit. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339–40 (Fed.Cir. 2003); *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1365 (Fed.Cir.2002).

The '363 patent has three claims. StorageTek's motion for preliminary injunction is based on claim 1 which reads:

1. A spool of magnetic recording tape comprising:

an elongated continuous web of flexible plastic substrate material having two edges and defining a front major surface and a back major surface,

a magnetic storage medium formed on the front major surface, the magnetic storage medium for defining a multiplicity of longitudinal data recording and playback tracks, each said track having a nominal lateral location relative to the other tracks,

a predetermined optically manifested track servo pattern defined on the back major surface, the pattern for indicating actual lateral displacement of the tape away from a nominal lateral location of said track during tape movement across a read/write head.

('363 patent, col. 8, ll. 27–41).

■ At the hearing Quantum asserted that claim 1 of the '363 patent is anticipated by four earlier patents: U.S. Patent No. 4,816,939 issued March 28, 1989 to Ford et al. ("the Ford patent"); U.S. Patent No. 5,120,927 issued June 9, 1992 to Williams et al. ("the Williams '927 patent")[1]; U.S. Patent No. 5,462,823 issued October 31, 1995 to Evans et al. ("the Evans patent"), and U.S. Patent No. 5,535,190 issued July 9, 1996 to Moore et al. ("the Moore patent"). Quantum further argued that these patents alone or in combination render claim 1 of the '363 patent obvious. Quantum also pointed to U.S. Patent No. 4,961,123 issued October 2, 1990 to Williams, et al. ("the Williams '123 patent") and U.S. Patent No. 5,067,039 issued November 19, 1991 to Godwin et al. ("the Godwin '039 patent") as evidence that the claim-in-suit is obvious.

The Ford patent, the Williams '123 patent (a relative of the Williams '927 patent), the Godwin '039 patent, and the Evans patent are among the references cited in

---

1. The Williams '927 patent was not identified by Quantum in its interrogatory responses as providing a factual basis for its anticipation defense. (Exs. 74 and 75). Quantum's post-hearing brief emphasizes the Ford, Evans and Moore patents as the ones relevant to its anticipation defense.

the '363 patent. Typically the PTO's consideration of cited references suggests that the claimed invention is patentable in light of them. The '363 patent has a particularly unusual history, and the PTO has taken contradictory positions about whether the claimed tape is novel in light of prior art.

The named inventors on the '363 patent are Michael Leonhardt and Scott David Wilson. Both were employed at Storage-Tek during the relevant time period. Mr. Leonhardt testified that in 1989 he began thinking about idea of a servo system using magnetic tape with optical servo tracks on the back side of the tape. Mr. Leonhardt returned to the idea in 1991 and again in 1996. He testified that he and others at StorageTek reduced this concept to practice on June 13, 1997. StorageTek filed a patent application on December 1, 1997.

At about the same time that Mr. Leonhardt and his co-workers at StorageTek were working on the concept of magnetic tape with optical servo tracks on the back side of the tape, Quantum employees were working on the same concept. On March 24, 1998, Quantum filed a patent application that included claims for magnetic tape with an optical servo track pattern on the back side of the tape.

The PTO initially rejected Quantum's application claims on the ground that they were anticipated by two prior art patents, U.S. Patent No. 5,065,387 to Roth et al. and another Williams patent, U.S. Patent No. 5,877,910. Quantum overcame those rejections, arguing that the Roth and Williams patents relate to optical servo techniques on disk media, but do not disclose the placement or use of optically detectable servo tracks on the non-recording side of magnetic tape. On May 17, 2000, the PTO issued a notice of allowance to Quantum. The arguments made by Quantum to obtain allowance are comparable to StorageTek's arguments in this case.

Separately, on July 4, 2000, the PTO issued the first of a series of related patents to StorageTek. The first patent, U.S. Patent No. 6,084,740 ("the 740 patent"), claimed an optical servo system for a tape drive that operates with tape that has data tracks written on a recording surface of the tape and optical servo tracks formed on the back side. The '740 patent disclosed, but did not claim, the tape invention at issue here. After the '740 patent was issued to StorageTek, Quantum cited the '740 patent to the PTO. The PTO then rejected Quantum's tape claims, finding they were anticipated by StorageTek's '740 patent.

Thereafter, StorageTek put Quantum's tape claims in its own continuation application. The PTO reconsidered the tape claims and found them allowable to StorageTek. The '363 patent issued to Storage-Tek on April 15, 2003. This action was filed on that day.

Quantum was at that time pursuing a course of challenging StorageTek's right to the tape claims in the PTO forum. The context for that effort was a patent application filed by the Kao Corporation. Employees at the Kao Corporation in Japan had collaborated with Quantum employees on the development of Quantum's SDLT tape and tape drive system. In February 2003, Quantum had added to a pending Kao patent application claims with the same language as the claims of the '363 patent. On February 26, 2003, Quantum filed a request for interference, seeking a determination of priority between Storage-Tek's claims and corresponding claims in the Kao/Quantum application.

The interference included three counts. Interference counts one and two were directed to claims 17–19 of StorageTek's application 10/116,403, which are the application claims that became claims 1–3 of the '363 patent. The third count involved

claims in two other StorageTek patents, U.S. Patent No. 6,236,529 B1, issued May 22, 2002, and U.S. Patent No. 6,480,351, issued November 12, 2002.

In September 2004, the PTO allowed certain claims in the Kao/Quantum application, including ones corresponding to the '363 patent claims, but suspended allowance due to a potential interference. Then, on November 18, 2004, Quantum filed a request for continuing application with the Patent Office. Quantum's filing of this request had the effect of withdrawing its request for an interference and initiating a normal patent examination process. In December 2004, Quantum filed an Information Disclosure Statement describing relevant prior art. Thereafter, on February 7, 2005, the PTO rejected the tape claims in the Kao/Quantum application (that is, the claims that correspond to the claims of the '363 patent) as anticipated by two prior art references, the Moore and the Evans patents.

■ In sum, the PTO has considered the same tape claims in connection with three different patent applications. The PTO initially allowed the claims in response to Quantum's first application. It then rejected Quantum's application in light of StorageTek's '740 patent. The PTO allowed the claims in response to StorageTek's application and issued the '363 patent. In response to the Kao/Quantum application, the PTO initially found the same tape claims to be allowable, but later rejected the claims after Quantum filed its December 2004 Information Disclosure Statement. The PTO has taken contradictory positions regarding the same claim language in different applications, and under these circumstances, the presumption of correctness normally afforded to PTO determinations is of little assistance to either party.

■ Turning then to Quantum's defenses, "[i]nvalidity for anticipation requires that all of the elements and limitations of the claim are found within a prior art reference." *Scripps Clinic & Research Found. Inc. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed.Cir.1991). Quantum also defends on the basis of obviousness. StorageTek complains of procedural unfairness, arguing that Quantum failed to give proper notice of this defense to claim 1 of the '363 patent. StorageTek states it did not present all the evidence it could have because it was misled about Quantum's strategy. StorageTek's complaint in this regard is without merit. Quantum's discovery responses identified obviousness as a defense to claim 1 of the '363 patent. Quantum's defenses listed in the agreed preliminary injunction hearing plan and order include 35 U.S.C. § 103.

■ Section 103(a) provides:

A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Obviousness is a question of law to be determined based on the following factual considerations: (1) the scope of the prior art; (2) the differences between the prior art and the claims at issue, and (3) the level of ordinary skill in the pertinent art. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Secondary considerations of nonobviousness, such as commercial success, unsolved need, failure of others, and copying must also be considered. *Id.* Furthermore, when obviousness is asserted on the basis of a combination of prior art references, "the law requires some teaching, suggestion, or reason to combine cited references." *McGinley v. Franklin Sports,*

*Inc.,* 262 F.3d 1339, 1350 (Fed.Cir.2001) (internal quotations and citations omitted).

The relevant art includes recording and servo technology for magnetic and optical data storage media. Background information about the relevant art was provided by Mr. Leonhardt, Dr. Durkee Richards, and Dr. Christopher Evans, who were called as witnesses by StorageTek, and Mr. Arthur Moore and Mr. Jimmy Godwin, who testified as witnesses called by Quantum. Examples of magnetic tape cartridges, hard and floppy magnetic disks, and a compact disk were introduced as demonstrative exhibits during the testimony of Mr. Benson, who explained basic similarities and differences among these recording methods.

Magnetic storage is a method whereby data is stored by selective polarization of magnetic material on the surface of the medium. Examples of magnetic recording media are magnetic tape and magnetic disks. Magnetic disks may be made of rigid material (i.e., "hard disk"), or more flexible material (i.e., "floppy disk"). All magnetic recording media share some basic characteristics. They are generally composed of a substrate material, typically a plastic material such as polyethylene terephthalate ("PET"), and they have at least one side coated with magnetically sensitive material. Magnetic tape is generally made of a thinner substrate than that used for disks. Another difference is that disks may be made with magnetic coatings on both sides. In contrast, the magnetic coating for spooled tape is placed only on one side to avoid being compromised by contact with another magnetic surface.

Another category of recording media is optical data storage media. Compact disks ("CDs") and digital video disks ("DVDs") are examples of optical storage media. Optical storage devices operate with drives that detect variations in the optical properties of the media surface.

With any type of media, the data is recorded in tracks. These tracks take various forms, depending on the type of media. Data tracks on disks may be formed in concentric circles. On magnetic tape, the data tracks are formed longitudinally or sometimes helically. Data storage capacity of any media depends in large part upon how closely together the data tracks are written.

To ensure that data is accurately written and read, the read/write head of the drive must be properly positioned in relation to the data tracks on the medium. This requires some method for referencing the location of the data tracks. Servo marks or patterns provide this reference. Magnetic servo tracking was known in the art of magnetic recording. Optical data storage media employed optical servo tracking. The invention of the '363 patent represents a combination of magnetic data recording and optical servo tracking. The purported novelty of the '363 patent is the placement of optical servo tracks on the back side of magnetic tape. The advantage of placing optical servo tracks on the back side of magnetic tape is that it allows more space on the front side of the tape to be used for data recording, thereby increasing the data storage capacity of the tape.

The meaning of the term "magnetic tape" in claim 1 of the '363 patent is disputed. Mr. Benson testified that magnetic tape generally has three layers consisting of a substrate, a top layer of magnetically sensitive material, and bottom layer or backcoat. Mr. Benson explained that the backcoat, which typically contains carbon, is necessary for electrostatic control, reliable movement of the tape through the tape drive, and proper formation of spooled tape. StorageTek's expert witness, Dr. Durkee Richards, also testified about these attributes of the backcoat of magnetic tape. StorageTek contends that

the term "magnetic tape" in the '363 patent refers to conventional tape of this type. StorageTek attempts to distinguish claim 1 of the '363 patent from prior art, particularly the Evans and Moore patents, based on its interpretation of magnetic tape as having a backcoat containing carbon.

▄▄▄ Intrinsic evidence, consisting of the claim language, the specification, and the prosecution history, is the primary source for determining the meaning of claim terms. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir. 1996). The language of the patent does not specify that magnetic tape have three layers or a backcoat. The claim states that the tape has a front major surface having a magnetic storage medium for defining the data recording and playback tracks and a back major surface for defining the optically manifested track servo pattern. The specification states, "The tape used in the system has magnetic data tracks recorded on the front side of the tape and optical servo tracks, comprising regions of differing reflectivity or phase, on the back side of the tape." (*Id.,* col. 3, ll. 8–11). The specification indicates that "current magnetic media types" may be used, but it does not preclude others. (*See id.,* col. 3, ll. 11–17). No prosecution history has been cited as relevant to this claim construction issue.

▄▄▄ In closing argument, counsel for StorageTek stated that the claim construction dispute relates to the word "surface" in the context of the term "back major surface." The claim language and the specification do not indicate that the word "surface" has any special meaning. Words in a claim are to be given their ordinary and accustomed meaning unless the patentee has acted as his own lexicographer by explicitly setting forth the meaning of a claim term, or has used a term so lacking in clarity that the scope of the claim must be ascertained from elsewhere in the pat-

ent or other sources. *Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed.Cir.2002); *Johnson Worldwide Assocs. v. Zebco Corp.,* 175 F.3d 985, 990 (Fed.Cir.1999). "Surface" should be construed according to its ordinary meaning: "The exterior or upper boundary of an object or body," *Merriam Webster Online Dictionary, www.m-w.com;* or "The outer or topmost boundary of an object. A material layer constituting such a boundary," *www.dictionary.com.*

The Ford patent, issued in March 1989, discloses the use of an optical servo technique with magnetic recording media, which may be either a disk or tape. Ford teaches the creation of an optical servo pattern on a magnetic medium by passing light through a transparent substrate and through an optical grating on the medium and through an optical grating off the medium. This creates "moire fringes" on one surface of the magnetic medium. The moire fringes are optical patterns that can be used to provide control for the drive mechanism. (Ford patent, col. 3, l. 61—col. 4, l. 2). Ford differs from claim 1 of the '363 patent because Ford does not disclose an optical servo pattern defined on the medium. Ford's optical servo pattern, the moire fringes, is generated by a source apart from the medium, and thus Ford does not anticipate claim 1 of the '363 patent. Ford is merely illustrative of an optical servo technique with magnetic recording media.

Mr. Godwin testified that in approximately 1989 a product called the Floptical disk was developed and commercialized by Insite Peripherals, Inc. The Floptical disk was a floppy disk—a type of magnetic data storage media—with optical servo tracks or patterns on the medium itself. By using optical servo tracking, the density of the magnetic data tracks could be increased, thus increasing the data storage

capacity of a floppy disk. Inventions developed by Insite employees resulted in a number of patents, including the Williams '123 patent, the Godwin '039 patent, and the Williams '927 patent. The Godwin '039 patent discloses optical servo patterns formed by creating pits in the magnetic recording layer of a magnetic storage medium. The Williams '123 and '927 patents disclose a magnetic information storage medium with optical servo patterns created by inscribing grooves or charring a pattern on or through the magnetic coating located on the substrate of the medium. These patents identify magnetic tape as a type of magnetic storage medium within their scope, but they do not explicitly describe putting optical servo tracks on the non-recording surface of magnetic tape. The Insite patents are primarily concerned with optical servo tracks on floppy disks.

After Insite's development of the Floptical disk, others sought to improve upon this technological advance. The Evans patent, issued in October 1995, addressed the manufacturing problem of providing optical servo tracking information on floppy disks "on a factory scale." (Evans patent, col. 3, ll. 8–9). Evans discloses a recording material with a substrate coated on at least one major surface with a layer of magnetic recording medium, and having a photosensitive layer that, when exposed to light or other radiation, creates a pattern that can be employed for optical servo tracking. (Id., col. 4, l. 62–col. 5, l. 3, col. 6, ll. 30–41). The primary purpose of the invention was to provide optical servo tracking information for magnetic floppy disks, but the patent states that the disclosed methods can be used for other purposes such as distinguishing a counterfeit article from a genuine one or for security markings on credit, charge, and bankers cards. (Id., col. 4, ll. 46–56). The patent states that it has applicability to various types of magnetic recording media, including "magnetic tapes, disks, diskettes, cards, drums and data cartridges for a variety of audio, video, and computer uses." (Id., col. 4, ll. 59–61). Dr. Evans, one of the three named inventors, explained that the patent's secondary purpose of providing a distinct identification mark would be applicable to tape, but the processes described are not applicable to making optical servo tracks along a length of tape. The Evans patent does not anticipate claim 1 of the '363 patent, but it is relevant to the issue of obviousness.

Mr. Leonhardt derived his concept for the magnetic tape invention of the '363 patent from the Floptical technology. Mr. Leonhardt sought to increase the storage capacity of magnetic tape. The novelty of claim 1 of the '363 patent—the purported paradigm shift—is the concept of putting optical servo information on the surface opposite from the magnetically sensitive surface used for data recording. StorageTek asserts its inventors were the first to create magnetic tape with optical servo tracks on the back side. Mr. Leonhardt testified that his concept was reduced to practice on June 13, 1997. Notably, he did not explain what was accomplished on that date. The deposition testimony of Mr. Archibald Smith provides little more. Mr. Smith testified that he worked with Mr. Leonhardt to make a model for experimental purposes using a rotating drum with a segment of tape wrapped around it, a laser system for writing tracks on the tape, and a monitoring system for measuring the contrast of the written tracks.

The use of a laser beam to inscribe servo tracks on magnetic tape is illustrated in the Williams '927 patent. ('927 patent, col. 8, ll. 11–15, and fig. 6). With respect to tape, that patent shows optical servo tracks on the same surface as the data tracks. (Id., col. 8, ll. 4–10; fig. 5). The concept of forming an optically detectable

pattern on a surface other than one used for magnetic data recording is expressed in the Evans patent which states, "In the case of single layer materials the photosensitive layer may be provided on the same or on the reverse (non-coated) side of the support." (Evans patent, col. 5, ll. 1–3). As described above, tape has a single magnetically sensitive layer.

The Moore patent also discloses a recording medium with a magnetic surface on one side, and optical servo information separate from the magnetic data recording surface. The problem addressed in the Moore patent is that the optical recording device known as the CD–ROM lacked the capability of being updatable. (Moore patent, col. 2, ll. 1–7; col. 4, ll. 29–37). In contrast, data stored on magnetic recording media is easily erased and re-written. The solution shown by Moore is coating one side of an optical recording medium with a transparent magnetic coating. Moore illustrates systems for optically servoing a disk having a magnetic layer for data recording. Moore is principally concerned with disk-shaped media, but also describes the use of a tapelike medium. (Id., col. 5, ll. 25–41; fig. 4). Moore's tapelike medium has optically detectable information located in the substrate. Unlike the tape of claim 1 of the '363 patent, the optically detectable information is not defined on the outermost layer of material. The Moore patent does not anticipate claim 1 of the '363 patent, but it shows optical servo information located apart from the magnetic recording surface.

On cross-examination, Dr. Richards acknowledged that the paradigm shift purportedly represented by the '363 patent was a "mind set change." Dr. Richards conceded that the "technology blocks" necessary for creation of the invention of the '363 patent were present in the prior art. (Hrg. Tr. at 499–500).

With respect to secondary considerations such as commercial success, failure of others, or unsolved need, the evidence was inconclusive. There was evidence about the commercial success of Quantum's products, but no evidence showing a relationship between that success and the purported novelty of the '363 patent. Quantum's SDLT products compete with another product line, the LTO products manufactured by IBM and others. LTO products employ magnetic rather than optical servo technology. Mr. Benson testified that current LTO products have sufficient storage capacity to compete with the SDLT products and customers don't care whether a particular data storage product uses optical or magnetic servo technology.

StorageTek emphasizes the deposition testimony of Mr. Carol Turgeon, a former Quantum employee who was involved in Quantum's SDLT development project. Mr. Turgeon testified that in mid–1997 he advocated the idea of applying optical servo tracks to the magnetic side of tape and was skeptical about the feasibility of back side optical servo tracking. Other engineers at Quantum disagreed with Mr. Turgeon, and senior staff decided to pursue the development of back side optical servo tracking. The fact that engineers at Quantum had different views about the preferred placement of optical servo marks on tape adds little to the determination of obviousness or nonobviousness.

In its post-hearing brief, Quantum requests that the court declare as a matter of law that the '363 patent is invalid, arguing that the evidence of anticipation and obviousness has been "thoroughly ventilated." (Quantum response br. on § 103 obviousness defense, at 15). On the question of anticipation, the evidence presented at the hearing showed that none of the prior art cited by Quantum anticipates claim 1 of the '363 patent. On the issue of obvious-

ness, StorageTek did not show that Quantum's defense lacks substantial merit. StorageTek did not demonstrate that a preliminary injunction is appropriate in light of the balance of hardships, the impact of the injunction on the public interest, and the potential harm to StorageTek if the injunction were not granted.

Based on the foregoing, it is

ORDERED that Storage Technology Corporation's motion for preliminary injunction is denied.